UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD HOLT DUNKELBERGER and SARAH ALLEN,<br><br>                              Plaintiffs,<br><br>        -v-<br><br>RICHARD HENRY DUNKELBERGER, MERILYN GALE DUNKELBERGER, WILLIAM WILLARD DUNKELBERGER, BENJAMIN DUNKELBERGER, SCOTT REILLY, JOSEPH IZZO, RYAN DELANEY, COME N. KETCHAKEU, ANTHONY GENTILE, CRAIG SIEGAL, JOHN FITZGERALD and JOHN DOE,<br><br>                              Defendants. | Case No. 14-CV-3877 (KMK)<br><br>OPINION & ORDER |

Appearances:

Anthony M. Giordano, Esq.
Giordano Law Office
Ossining, NY
*Counsel for Plaintiffs*

Jonathan Matthew Victor, Esq.
Law Office of Jonathan Victor PLLC
Mahopac, NY
*Counsel for Defendants Richard Henry Dunkelberger, Merilyn Gale Dunkelberger, William Willard Dunkelberger, and Benjamin Dunkelberger*

Inna Ringh, Esq.
Adam Joseph Sansolo, Esq.
Attorney General of the State of New York
New York, NY
*Counsel for Defendants Scott Reilly, Joseph Izzo, Ryan Delaney, Come N. Ketchakeu, and Anthony Gentile*

Eric Daniel Feldman, Esq.
Law Firm of Louis Ginsberg, P.C.
New York, NY
*Counsel for Defendants Craig Siegal and John Fitzgerald*

KENNETH M. KARAS, District Judge:

Plaintiffs Sarah Allen ("Sarah") and Richard Holt Dunkelberger ("Richard") bring claims against Richard Henry Dunkelberger ("Dunkelberger"), Merilyn Gale Dunkelberger ("Gayle"), William Willard Dunkelberger ("William"), and Benjamin Dunkelberger ("Benjamin") (collectively the "Dunkelberger Defendants"); Scott Reilly ("Reilly"), Joseph Izzo ("Izzo"), Ryan Delaney ("Delaney"), Come N. Ketchakeu ("Ketchakeu"), and Anthony Gentile ("Gentile") (collectively the "State Trooper Defendants"); and Craig Siegal ("Siegal") and John Fitzgerald ("Fitzgerald") (collectively the "Somers Police Defendants"), alleging that Defendants violated their constitutional rights and committed state torts.[1]  The Dunkelberger Defendants, the State Trooper Defendants, and the Somers Police Defendants move to dismiss all claims asserted against them.  For the following reasons, each Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for the purpose of these Motions To Dismiss.[2]  Richard is the son of Dunkelberger and Dunkelberger's former wife, Gayle.  (Second Am. Compl. ¶¶ 8–9 (Dkt. No. 16).)  William and Benjamin are Richard's brothers.  (*Id.* ¶¶ 10–11.)  Sarah is Richard's

---

[1] Because many of the Parties share the same last name, the Court follows the naming conventions used in the Complaint.

[2] In their Opposition, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint.  Furthermore, they attach two documents in their Opposition to the Somers Police Defendants' and the State Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police Field Manual regarding mentally ill persons. For the reasons discussed below, the Court disregards any facts not alleged in the Second Amended Complaint.

girlfriend.  (*Id.* ¶ 123.)  Reilly, Izzo, Delaney, Ketchakeu, and Gentile were New York State Troopers stationed at the Somers trooper barracks, (*id.* ¶¶ 12–16); John Doe represents unknown members of the New York State police believed to be stationed in Somers, (*id.* ¶ 19); and Siegal and Fitzgerald were Somers Police Department Officers, (*id.* ¶¶ 17–18).

On March 15, 2012, and at all relevant times, Dunkelberger resided in a separate apartment in the home of Richard and Sarah at 210 Rte. 100 in Somers.  (*Id.* ¶ 20.)  Richard and Dunkelberger had been in an ownership dispute over that property.  (*Id.* ¶ 21.)  Plaintiffs allege that Richard owned the property, but years earlier had transferred the title to Dunkelberger without a written agreement or consideration so Dunkelberger could obtain a mortgage to pay off debt, with the understanding that Dunkelberger would pay the mortgage, obtain life insurance to pay the debt in the event of his death, and eventually return title to Richard.  (*See id.* ¶ 22.)  According to Richard, however, once he transferred the title to Dunkelberger, Dunkelberger obtained a mortgage but did not make any payments or obtain life insurance, and refused to return the title to Richard.  (*Id.* ¶ 23.)  Richard made payments on the mortgage until 2012, at which point he refused to make further payments and demanded that his father either make the future payments or return the title to him.  (*Id.* ¶ 24.)  This caused the Dunkelberger Defendants to become angry with Richard.  (*Id.* ¶ 25.)

According to Plaintiffs, the Dunkelberger Defendants decided that they would try to have Richard arrested and removed from the property, and then rent the apartment and use the rental income to pay Dunkelberger's mortgage.  (*Id.* ¶ 26.)  Plaintiffs further allege that the Dunkelberger Defendants agreed that Gayle would file a false police report alleging that Richard threatened to harm himself and had weapons in the house, and "in furtherance of their conspiracy" to remove Richard, Gayle called the state police in Somers on March 15, 2012 and

"reported this false claim." (*Id.* ¶¶ 27–28.)  Plaintiffs allege, upon information and belief, that Gayle was "advised that the troopers would want to enter the home to search and remove the weapons in there but that they could not enter without a warrant unless an emergency existed," and that if Richard "threatened someone at the house, police could use such a threat to search the house for the person threatened and remove both the weapons" and Richard.  (*Id.* ¶ 29.)  Plaintiffs allege, upon information and belief that "at the direction of the State Police," Gayle had Dunkelberger picked up at his apartment and driven to Gayle's home, then reported to the police that Dunkelberger might be in danger.  (*Id.* ¶ 30.)  Plaintiffs allege, upon information and belief, that the "police did not ask Gayle for the source of her information regarding Richard's alleged suicide or her belief that Dunkelberger might be in danger."  (*Id.* ¶ 31 (internal quotation marks omitted).)  On March 15, 2012, before the police arrived, Dunkelberger left his apartment, entered a vehicle operated by one of the Dunkelberger Defendants, and drove to Gayle's home.  (*Id.* ¶ 32.)  Plaintiffs allege that all Defendants knew that Dunkelberger was not at the residence.  (*Id.* ¶ 112.)

At approximately 6:20 PM on March 15, 2012, Richard and Sarah were at their home when Richard saw a police vehicle in the driveway, and he exited the home and walked to the edge of the fence to ask why they were there.  (*Id.* ¶¶ 33–34.)  Delaney, standing behind a police vehicle, yelled into a microphone, asking if anyone else was in the house.  (*Id.* ¶ 36.)  Plaintiff said yes and, without warning, cause, or justification, a trooper standing next to Delaney pointed a shotgun at Richard's head and ordered him not to move.  (*Id.* ¶ 37.)  At the same time, another trooper raised a semi-automatic revolver at Richard.  (*Id.* ¶ 38.)  With two weapons pointed at him, Richard heard a shotgun rack behind him and assumed it was pointed at him.  (*Id.* ¶ 39.)  At this time, Delaney demanded Richard provide his name and age.  (*Id.* ¶ 42.)  Richard gave his

name and began reaching for his wallet for identification, and a state trooper holding a semiautomatic pistol raised it toward Richard's head and told him not to reach.  (*Id.* ¶ 43.) Richard was handcuffed from behind and forced to lie down on a concrete walk.  (*Id.* ¶ 44.) Delaney demanded that Richard disclose where he kept his guns, and struck him in the back with a fist or foot, causing him pain and to lose his breath.  (*Id.* ¶ 45.)

Two troopers picked Richard up off the ground and began a search of his person.  (*Id.* ¶ 46.)  No one informed Richard why they were there or why he was detained.  (*Id.* ¶ 47.) Although Richard's hands were handcuffed behind his back, a state trooper continuously aimed a weapon at Richard.  (*Id.* ¶ 48.)  During the search, police found a small pocketknife used by Richard to open his nicotine gum in his wallet.  (*Id.* ¶ 49.)  A trooper asked Richard why he carried the knife, Richard responded that he used it to open his nicotine gum, and a nearby trooper holding a shotgun raised it toward Richard, racked it, and shouted, "gun."  (*Id.* ¶ 50.) Richard was then placed, handcuffed, into the back of a state trooper vehicle.  (*Id.* ¶ 51.)  At the time, no trooper had asked Richard if he was suicidal or had threatened harm to himself or anyone else.  (*Id.*)  Richard complained to the troopers that the handcuffs were too tight and were hurting him, but the troopers did not loosen them.  (*Id.* ¶ 52.)

Before Richard was placed in the car, two troopers banged on the kitchen door, which was answered by Sarah.  (*Id.* ¶¶ 53–55.)  The troopers saw Plaintiffs' dog and ordered Sarah to secure it in another room.  (*Id.* ¶ 56.)  The troopers then entered the house, asking, without providing context, where Dunkelberger was.  (*Id.* ¶ 57.)  At no time before that did the troopers ask Sarah whether Richard was suicidal or whether Dunkelberger might be in danger.  (*Id.* ¶ 58.) Sarah told police she did not know where Dunkelberger was, but assumed he was in his apartment, and the two troopers escorted Sarah upstairs and began a room-to-room search of the

home, beginning with Dunkelberger's apartment.  (*Id.* ¶ 59.)  There was no objective indication that an emergency situation existed, and the troopers ignored the fact that the apartment had a separate outside entrance.  (*Id.*)  As the troopers searched the home, the Somers Police Defendants arrived and joined the search.  (*Id.* ¶ 62.)  At various points during the search, all of the Somers Police Defendants and the State Trooper Defendants entered the home.  (*See id.* ¶ 63.)  At no time during the police action did Richard express suicidal ideations, appear mentally ill, or act in a manner likely injurious to himself or others.  (*Id.* ¶ 64.)

Gayle was present and observed the search of Plaintiffs' home from Plaintiffs' driveway, with the consent of the State Trooper Defendants.  (*Id.* ¶ 65.)  The troopers then sought access to Richard's gun safe to remove the weapons.  (*Id.* ¶ 66.)  Delaney demanded that Sarah tell him where the gun safe was, and, after having Sarah remove the dog from the bedroom, Delaney entered the bedroom to access the locked and secured gun safe.  (*Id.* ¶¶ 67–69.)  Delaney demanded Sarah give him the key to the safe, but she did not have it and told him that she did not know where it was kept, at which time Delaney threatened to arrest her for obstructing justice.  (*Id.* ¶¶ 70–71.)

At that point, Richard was finally asked by a trooper if he had threatened to harm himself or kill himself, and Richard told him no.  (*Id.* ¶¶ 73–74.)  Fitzgerald then approached Richard and told him that prescription drugs were found out of their bottles, and that Richard would likely be charged with a felony.  (*Id.* ¶ 75.)  Delaney then came to the car and demanded that Richard give him the gun safe key.  (*Id.* ¶ 76.)  Richard denied having the key, and Delaney accused him of lying and threatened to rip the safe off the wall or have a locksmith come to open it.  (*Id.* ¶ 77.)  Richard declined to provide the key or otherwise respond to interrogation, exercising his Fifth Amendment rights.  (*Id.* ¶ 78.)  However, Delaney, without having

administered *Miranda* warnings, continued to interrogate Richard, and threatened to arrest him if he continued to refuse to disclose the key's whereabouts. (*Id.* ¶ 79.) When Delaney threatened to arrest Sarah, Richard agreed to disclose the key's location to Sarah. (*Id.*) Sarah was then escorted to the patrol car, where she saw at least six officers in the driveway with weapons out, and Richard gave her the combination to a case, inside of which was the gun safe key. (*Id.* ¶¶ 80–81.) Sarah was escorted back to the house, but, when she was unable to immediately open the case due to the trauma caused by the circumstances, Delaney roughly grabbed her arm and threatened to arrest her if she did not open the case "now." (*Id.* ¶ 82.) Once they gained access to the safe, the police began removing the weapons. (*Id.* ¶ 83.) In Sarah's presence, one officer asked Delaney what to do with bb guns in the safe, to which Delaney responded that "all weapons were to be removed as it would 'be a shame to have to come back and kill him [Richard] over bb guns.'" (*Id.* ¶ 84.)

After police removed the weapons, Delaney drove Richard to the hospital for admission under New York's Mental Hygiene Law § 9.41, "notwithstanding the fact that [Richard] exhibited no indicia of mental illness or suicidal ideations or threatening conduct." (*Id.* ¶ 85.) Doctors found Richard competent and not a suicide risk and released him. (*Id.* ¶ 90.) Additionally, Richard was charged with weapons possession for an unregistered handgun, but the charge was dropped by prosecutors due to the allegedly illegal search of his home and gun safe. (*Id.* ¶ 91.) Plaintiffs allege that during the criminal prosecution, state troopers provided false information in an attempt to justify their detention, including that Richard was observed "frothing at the mouth." (*Id.* ¶ 92.)

In December 2012, John Doe, an unknown state police officer, released Richard's weapons to the Dunkelberger Defendants without Richard's permission. (*Id.* ¶ 93.) The

Dunkelberger Defendants have since refused to return the weapons to Richard, despite Richard having demanded their return and despite Richard being the true owner of the guns. (*Id.*)

Plaintiffs further allege that the search and seizure was done without a warrant and at no time was Richard intoxicated, incapacitated, threatening or disorderly, and had committed no criminal offense and engaged in no criminal behavior in the presence of police or known to police." (*Id.* ¶¶ 94, 97–98.) Plaintiffs further allege that they did not consent to police entering their home. (*Id.* ¶ 101.)

B. Procedural Background

Plaintiffs filed suit in New York State Supreme Court, County of Westchester on April 18, 2014. (*See* Notice of Removal (Dkt. No. 1).) The Somers Police Defendants removed to federal court on May 30, 2014, (*see id.*), which was consented to by the State Trooper Defendants, (*see* Dkt. No. 5), and by the Dunkelberger Defendants, (*see* Dkt. No. 6). On June 16, 2014, Plaintiffs filed the First Amended Complaint. (Dkt. No. 9.) On September 24, 2014, the Court held a pre-motion conference, and granted Plaintiffs permission to file a Second Amended Complaint and for Defendants to then move to dismiss. (*See* Dkt. (minute entry for Sept. 24, 2014).) Plaintiffs filed the Second Amended Complaint on October 14, 2014. (Dkt. No. 16.)

Pursuant to a schedule set by the Court, (Dkt. (minute entry for Sept. 24, 2014)), and extended on request of the Parties, (Dkt. No. 24), the Parties submitted the following papers: On October 29, 2014, the Dunkelberger Defendants filed their Motion To Dismiss and accompanying papers, (Dkt. No. 17), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 26), and the Dunkelberger Defendants replied on January 5, 2015, (Dkt. No. 29). On October 30, 2014, the Somers Police Defendants filed their Motion and accompanying papers,

(Dkt. Nos. 18–19), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 27), and the

Somers Police Defendants replied on January 6, 2015, (Dkt. No. 30).  Finally, the State Trooper

Defendants filed their Motion and accompanying papers on November 3, 2014, (Dkt. Nos. 21–

22), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 28), and the State Trooper

Defendants replied on January 23, 2015, (Dkt. No. 32).  On July 31, 2015, the Court issued an

Order granting Plaintiffs permission to file a surreply memorandum no later than August 7, 2015,

responding to arguments raised for the first time in the State Trooper Defendants' Reply

Memorandum, (Dkt. No. 33.), which was timely filed (Dkt. No. 34).

## II.  Discussion

### A.  Standard of Review

Defendants moves to dismiss Plaintiffs' Second Amended Complaint under Rule 12(b)(6)

of the Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion

to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly,* 550 U.S.

544, 555 (2007) (alterations, citations, and internal quotation marks omitted).  Indeed, Rule 8 of

the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a

complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*

(alterations and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations

must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at

555.  Although "once a claim has been stated adequately, it may be supported by showing any

set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must

allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id; see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Dixon v. United States*, No. 13-CV-2193, 2014 WL 23427, at *1 (S.D.N.Y. Jan. 2, 2014) ("For the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's] complaint are true.").  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, No. 13-CV-4384, 2014 WL 182341, at *1 n.1 (S.D.N.Y. Jan. 16, 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

B.  Analysis

1.  Materials Considered in Deciding this Motion

As noted above, in opposing Defendants' Motions, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint.  Furthermore, they

attach two documents in their Opposition to the Somers Police Defendants' and the State

Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police

Field Manual regarding mentally ill persons.  (*See* Pls.' Mem. of Law in Opp'n to Somers Defs.

S[ie]gal and Fitzgerald's Mot. To Dismiss ("Pls. Somers Police Opp'n") Exs. A, B (Dkt. No.

27); Mem. of Law in Opp'n to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b)(6) of

the FRCP ("Pls. State Trooper Opp'n") Exs. A, B (Dkt. No. 28).)  "In adjudicating a Rule

12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the

complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Israel Disc.*

*Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also*

*Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20,

2013) (same).  "To be incorporated by reference, the complaint must make a clear, definite[,] and

substantial reference to the documents[,] and to be integral to a complaint, the plaintiff must have

(1) actual notice of the extraneous information and (2) relied upon the documents in framing the

complaint."  *Bill Diodato Photography LLC v. Avon Prods, Inc.*, No. 12-CV-847, 2012 WL

4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (brackets and internal quotation marks omitted).

When considering whether a plaintiff relies on the document in framing the complaint, it is

sufficient if "the complaint relies heavily, albeit implicitly, upon [the document's] terms and

effect."  *Capela v. J.G. Wentworth, LLC*, No. 09-CV-882, 2009 WL 3128003, at *1 n.2

(E.D.N.Y. Sept. 24, 2009); *see also Baraliu v. Vinya Capital, L.P.*, No. 07-CV-4626, 2009 WL

959578, at *4 (S.D.N.Y. Mar. 31, 2009) (noting that a court may review "any documents that are

integral to [the] plaintiff's allegations even if not explicitly incorporated by reference").

The Court disregards all factual assertions contained in the summaries of facts in Plaintiffs' opposition papers but not in the Second Amended Complaint.  *See Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b)."); *Green v. City of Mount Vernon*, — F. Supp. 3d —, 2015 WL 1455701, at *10 (S.D.N.Y. Mar. 31, 2015) (declining to consider new factual allegations made by plaintiffs in their opposition papers); *Tolliver v. Skinner*, No. 12-CV-971, 2013 WL 658079, *11 (S.D.N.Y. Feb. 11, 2013) (same); *McCray v. City of New York*, No. 03-CV-9685, 2007 WL 4352748, at *30 n. 34 (S.D.N.Y. Dec. 11, 2007) (same); *GCG Int'l, Inc. v. Eberhardt*, No. 05-CV-2422, 2005 WL 2647942, at *4 (S.D.N.Y. Oct. 17, 2005) (same); *Arnold v. Goetz*, 245 F. Supp. 2d 527, 539 (S.D.N.Y. 2003) (same).[3]  As to the documents attached to Plaintiffs' Opposition to the Somers Police Defendants and the State Trooper Defendants, Plaintiffs offer no basis for the Court to consider them.  The Second Amended Complaint refers to the Manual in two paragraphs, (*see* Second Am. Compl. ¶¶ 87, 89), but this is insufficient to incorporate the document by reference.  Indeed, "[l]imited quotation does not constitute incorporation by reference," *Looney v. Black*, 702 F.3d 701, 716 n.2 (2d Cir. 2012) (internal quotation marks omitted), and Plaintiffs did not even do that.  Furthermore, because there is no reference to the 911 report in the Second Amended Complaint, it is not integral to the Complaint, and this is not the type of document of which the Court may take judicial notice.  *See Alvarez v. Cty. of Orange*, — F. Supp. 3d —, 2015 WL 1332347, at *10–11 (S.D.N.Y. Mar. 25, 2015) (declining to take judicial notice of a police incident report).

---

[3] It bears noting that Plaintiffs are not proceeding pro se.

### 2. Qualified Immunity

"A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (citation and internal quotation marks omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (same).  Because qualified immunity is "an affirmative defense [that] . . . reflects an immunity from suit rather than a mere defense to liability[,] . . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014) (emphasis and internal quotation marks omitted).  "In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the standard of qualified immunity as one of 'arguable probable cause.'" *Id.* (footnote omitted) (quoting *Cerrone*, 246 F.3d at 202).  "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone*, 246 F.3d at 202–03 (internal quotation marks omitted).  In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see also Betts*, 2013 WL 311124, at *4 (same).

### 3.  Plaintiffs' Claims against Police Officer Defendants

#### a.  State Claims

The State Trooper Defendants and the Somers Police Defendants moved to dismiss the state claims asserted against them.  (Mem. of Law in Supp. of Defs. Siegal and Fitzgerald's Mot. to Dismiss the Compl. ("Somers Police Defs.' Mem.") 14–15 (Dkt. No. 19); Mem. of Law in Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper Defs.' Mem.") 15–16 (Dkt. No. 22).)  In their Opposition, Plaintiffs conceded that the state law claims should be dismissed.  (Pls. Somers Police Opp'n 19; Pls. State Trooper Opp'n 19.)  These claims are therefore dismissed.  *See Alvarez*, 2015 WL 1332347, at *12 (dismissing claims where the plaintiff conceded he had failed to plausibly plead them and stated that he did not oppose the relief requested by the defendants); *Willner ex rel. Willner v. Doar*, No. 12-CV-1955, 2013 WL 4010205, at *1 (E.D.N.Y. Aug. 5, 2013) (dismissing a claim after the plaintiff made concessions in his opposition brief and consented to the dismissal of his due process claim); *Murphy v. Keller Indus., Inc.*, No. 95-CV-7643, 2002 WL 91622, at *1 (S.D.N.Y. Jan. 23, 2002) (granting the defendant's motion to dismiss after the plaintiff, in her opposition papers, "expressly conced[ed] that her claim against the [defendant] [was] barred by the Federal Tort Claims Act").

#### b.  Fourth Amendment Unreasonable Search Claim

Plaintiffs bring a Fourth Amendment claim against the State Trooper Defendants and the Somers Police Defendants based on the warrantless search of Plaintiffs' home.  The Somers Police Defendants and the State Trooper Defendants move to dismiss.  (*See* Somers Police Defs.' Mem. 6–11; State Trooper Defs.' Mem. 6–9.)  "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S.

14

Const. amend. IV). "Police officers must first obtain a warrant before they search a person's home, unless exigent or other circumstances justify a warrantless search." *Id.*; *see also Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014) ("Our cases establish that a warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness. And certain categories of permissible warrantless searches have long been recognized." (citations and internal quotation marks omitted)); *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable. But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and internal quotation marks omitted)). Because warrantless searches of the home are presumptively unreasonable, in the absence of a warrant, police officers need "'probable cause plus exigent circumstances in order to make a lawful entry into a home.'" *Harris v. O'Hare*, 770 F.3d 224, 231–32 (2d Cir. 2014) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)); *see also Soller v. Boudreux*, No. 12-CV-167, 2015 WL 500492, at *11 (E.D.N.Y. Feb. 3, 2015) ("'[W]hether the officers had probable cause . . . , is the first requirement for a warrantless search on the basis of exigent circumstances.'" (alterations in original) (quoting *Harris*, 770 F.3d at 232)). The Supreme Court has "identified several exigencies that may justify a warrantless search of a home." *King*, 131 S. Ct. at 1856 (discussing the exigencies that may justify a warrantless search). For example, as relevant here, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (internal quotation marks omitted).

Here, the State Trooper Defendants argue that the exigent circumstances and emergency aid exceptions apply.  (State Trooper Defs.' Mem. 6–9.)[4]  In such cases, the relevant question is whether "'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'"  *Jackson v. City of New York*, 29 F. Supp. 3d 161, 174 (E.D.N.Y. 2014) (alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)); *see also Harris*, 770 F.3d at 233 ("The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." (internal quotation marks omitted)).  Defendants also invoke the emergency aid exception.

"'This . . . exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.'"  *Soller*, 2015 WL 500492, at *12 (some internal quotation marks omitted) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).  "'It requires only an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid[,]' i.e., "that medical assistance was needed, or persons were in danger[.]'"  *Id.* (citation omitted) (quoting *Fisher*, 558 U.S. at 47).  In determining the reasonableness of the officer's belief that exigent circumstances existed, "[c]ourts must apply an objective standard," but nonetheless must apply the "probable cause requirement . . . by reference to the circumstances then confronting the officer, including the need for a prompt

---

[4] The Somers Police Defendants merely argue that they had probable cause to search the home, (*see* Somers Police Defs.' Mem. 5–6), but the existence of probable cause, on its own, is insufficient to justify a warrantless home search.

The Somers Police Defendants further claim that Sarah permitted them to enter, thus implying that consent could be another basis for the constitutionality of this search.  (*See id.* at 2.)  Although Defendants may be able to make this argument at summary judgment, here, Plaintiffs plainly allege that "[a]t no time did [P]laintiffs consent to police entering their home to conduct a search of it or consent to a search of [Richard's] gun safe."  (Second Am. Compl. ¶ 101.)

assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney v. Davidson*, 133 F.3d 189, 196–97 (2d Cir. 1998) (alteration and internal quotation marks omitted).

According to the facts alleged in the Second Amended Complaint, Gayle called the New York State Police and made a false report that Richard threatened to harm himself and had weapons in the house. (Second Am. Compl. ¶¶ 27–28.) Allegedly, on the direction of the state police, Gayle had Dunkelberger picked up at his apartment and taken to Gayle's house. (*Id.* ¶¶ 30, 32.) Further, Gayle reported to the State Police that Dunkelberger "might be in danger." (*Id.* ¶ 30 (internal quotation marks omitted).) When the State Trooper Defendants arrived and asked Richard if anyone else was in the house, he responded, "yes." (*Id.* ¶¶ 36–37.) Sarah further told the State Trooper Defendants that she did not know Dunkelberger's whereabouts, but assumed he was in his apartment. (*Id.* ¶ 59.) However, Plaintiffs also allege that the State Trooper Defendants and the Somers Police Defendants *knew* Dunkelberger was not at the residence. (*Id.* ¶ 112.) Plaintiffs further emphasize that, other than the phone call from Gayle, there was no indication that Richard was mentally unstable or that there was any emergency situation. (*See, e.g.*, *id.* ¶¶ 59, 64, 66, 90.)

Information "provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994). "Significantly, when information furnished by a single complainant suffices to establish probable cause, such information often comes from the victim, who has provided specific details of the crime." *Id.*; *see also Morrison v. Brooks*, No. 13-CV-4216, 2015 WL 1276768, at *5 (E.D.N.Y. Mar. 13, 2015) ("Information indicating guilt of any crime furnished to police by the victim of a crime generally suffices to establish probable cause, where it seems

reasonable to believe that the victim is telling the truth." (alteration, citations, and internal quotation marks omitted)).  Courts have also held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth.  *See, e.g.*, *Bailey v. City of New York*, 79 F. Supp. 3d 424, 444 (E.D.N.Y. 2015) ("Law enforcement officials have probable cause to arrest if they receive credible information from putative victims or eyewitnesses.  A court will consider the reliability of the identification, including the corroborating circumstances and whether there was reason to question the veracity of the witness." (citations omitted)); *Vanderwoude v. City of New York*, No. 12-CV-9046, 2014 WL 2592457, at *15 (S.D.N.Y. June 10, 2014) ("[I]dentification of an individual as a perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." (internal quotation marks omitted)), *reconsideration denied*, 2014 WL 5139341 (S.D.N.Y. Sept. 30, 2014); *United States v. McManus*, No. 12-CR-356, 2012 WL 3526669, at *2 (S.D.N.Y. Aug. 10, 2012) (holding that an identification from "a disinterested eyewitness to one of the robberies . . . alone justified [the] arrest").

Here, under the facts alleged in the Complaint, the tip from Gayle was not anonymous, which points toward the existence of probable cause.  *Compare Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) (holding that an anonymous 911 call "could not, by itself, justify the warrantless entry" into a home), *with Sha v. N.Y.C. Police Dep't Twentieth Precinct, Detectives, Officers Doe*, No. 03-CV-5273, 2005 WL 877852, at *5 (S.D.N.Y. Apr. 18, 2005) (noting, in holding that there was probable cause for a warrantless entry, that "[t]he fact that [the complainant] was not an anonymous caller is a crucial point").  Additionally, the Second Circuit has recognized that even "an anonymous 911 call reporting an ongoing emergency is entitled to a

18

higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009). "This approach recognizes the need for police to act on reports of an emergency situation without delay, but still requires police officers to corroborate allegations of criminal activity in some meaningful way." *Id.* (citation omitted).

However, even assuming that Defendants would have been justified in conducting a warrantless search of Plaintiffs' home based on Gayle's tip on its own, or that they would have been entitled to qualified immunity for the same, Plaintiffs have alleged enough facts to plausibly claim that the search was still unreasonable. According to Plaintiffs' allegations, at the time the warrantless search began, Richard, who had come out of the house, was identified and handcuffed by the State Trooper Defendants. (*See* Second Am. Compl. ¶¶ 34, 43–44.) Furthermore, according to Plaintiffs, before entering the home, Sarah had also come to the front door. (*Id.* ¶ 54.) These allegations are most similar to the facts in *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011). In that case, officers entered the suspect's home, "removed him from his bedroom, placed him against the wall in the common hallway, and made sure that he had nothing in his possession that could harm them." *Id.* at 157. He was cooperative and non-combative. *Id.* In deciding that the subsequent warrantless search was unreasonable, the Second Circuit emphasized that "before conducting the search, the officers had effectively allayed the safety concerns that justified their initial questioning of [the suspect] and had, by exercising control over a compliant occupant and the surrounding premises, neutralized any threat that [the suspect] or the gun may have initially posed." *Id.* at 158. "Under these circumstances," the Second Circuit held, "there was simply no 'urgent need' to further search the home for the gun without a warrant." *Id.* Furthermore, based on the facts alleged in the Second Amended

Complaint, the officers knew that Dunkelberger was not present in the home, and therefore there was no reason to believe "that a person within the house [was] in need of immediate aid," *Soller*, 2015 WL 500492, at *12, and, given that Richard was restrained outside of the house, there was no need whatsoever to enter the home to recover the weapons at that time without a warrant, *see Simmons*, 661 F.3d at 158–59 (rejecting the argument that another person could have been in the home that either was in danger or posed a threat because there was no reason to believe anyone other than the suspect was in the home); *cf. Schoolcraft v. City of New York*, — F. Supp. 3d —, 2015 WL 2070187, at *32 (S.D.N.Y. May 5, 2015) (holding that because "the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance," even if the initial warrantless entry is justified, the decision to remain is also evaluated on a reasonableness standard), *reconsideration granted on other grounds*, 2015 WL 5542770 (S.D.N.Y. Sept. 18, 2015).  Thus, even if Defendants would have been entitled to do a warrantless entry and search of Plaintiffs' home based on Gayle's phone call, or even if they were entitled to qualified immunity on that ground, the search still would not have been justified because any threat Richard posed was neutralized before the search started since he was outside the home, handcuffed, and searched, and, under the facts alleged in the Second Amended Complaint, there was no reason to think that Dunkelberger or any other person was in danger inside the home.  Based on the facts alleged, no reasonable officer could think otherwise. Therefore, Defendants' Motion To Dismiss this claim is denied.[5]

---

[5] Of course, this issue could be re-visited at summary judgment, particularly the claim that Gayle worked with the State Trooper Defendants and Somers Police Defendants to remove Dunkelberger before the search was conducted.

c.  False Arrest Claim

Defendants also move to dismiss Plaintiffs' false arrest claim, arguing that they had probable cause to arrest Richard based on the New York Mental Hygiene Law ("MHL").  (*See* State Trooper Defs.' Mem. 9–11.)[6]  A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause."  *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same).  "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred."  *Jaegly*, 439 F.3d at 151 (internal quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." (internal quotation marks omitted)).[7]  Under New York Law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'"  *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

---

[6] The Somers Police Defendants argue generally there was probable cause to arrest.  (*See* Somers Police Defs.' Mem. 5–6.)

[7] "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 157 (S.D.N.Y. 2006) (same).  The only difference between § 1983 claims for false arrest and New York claims for false arrest or false imprisonment is that, under § 1983 the "tortfeasor [must] act under color of state law."  *Williams*, 428 F. Supp. 2d at 157 (internal quotation marks omitted)

The State Trooper Defendants and the Somers Police Defendants do not contest that the first three elements are met, but rather argue that the arrest was privileged because there was probable cause to arrest.  (*See* State Trooper Defs.' Mem. 9–11; Somers Police Defs.' Mem. 5–6.)  "Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983."  *Ackerson*, 702 F.3d at 19 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Conte v. Cty. of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same).  Requirements for arrests pursuant to the New York Mental Hygiene Law are interpreted "consistently with the requirements of the Fourth Amendment."  *Kerman*, 261 F.3d at 240 n.8.  The State Trooper Defendants argue that there was probable cause to arrest based on the New York Mental Hygiene Law.  Specifically, New York Mental Hygiene Law § 9.41 provides that

> [a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.  Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 . . . .

"[L]ikely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01.  Thus, Defendants' arrest of Richard was privileged if "they had probable cause to conclude that [he] was acting in a manner that invoked Section 9.41."  *Amato v. Hartnett*, 936 F. Supp. 2d 416, 435 (S.D.N.Y. 2013); *see also Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 456 (S.D.N.Y. 2012) ("[The] [d]efendants' conduct is privileged

where there was probable cause to believe that the individual was a danger to herself or others."); *Glowczenski v. Taser Int'l Inc.*, No. 04-CV-4052, 2010 WL 1936200, at *6 (E.D.N.Y. May 13, 2010) ("[B]efore a person can be seized and detained for psychiatric evaluation, an official must have probable cause to believe that the person is dangerous to himself or others.").

"An objective reasonableness standard is applied to police behavior under Section 9.41, as well as to claims under the Fourth Amendment," and the question thus becomes "'whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that [he] might be mentally ill and conducting [himself] in a manner likely to result in serious harm to [himself].'" *Amato*, 936 F. Supp. 2d at 435 (alterations in original) (quoting *Nicholas v. City of Binghamton,* No. 10-CV-1565, 2012 WL 3261409, at *5 (N.D.N.Y. Aug. 8, 2012)); *see also Burdick v. Johnson*, No. 06-CV-1465, 2009 WL 1707475, at *6 (N.D.N.Y. June 17, 2009) (same). "Whether a person seized pursuant to the MHL is later found to be mentally competent and released is irrelevant to the probable cause analysis." *Burdick*, 2009 WL 1707475, at *6; *see also Bayne v. Provost*, No. 04-CV-44, 2005 WL 1871182, at *7 (N.D.N.Y. Aug. 4, 2005) ("Like in the criminal context, a police officer is justified in relying upon a citizen's warning that another person has threatened suicide even if it is later determined by mental health professionals that the person presents no such risk."); *Sanchez v. Town of Greece*, No. 98-CV-6433, 2004 WL 1964505, at *4 (W.D.N.Y. Sept. 1, 2004) ("A mental hygiene arrest can be based on probable cause even though it is later determined that the arrested person does not suffer from a dangerous mental condition."); *Vallen v. Connelly*, No. 99-CV-9947, 2004 WL 555698, at *8 (S.D.N.Y. Mar. 19, 2004) ("Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, a mental health seizure can rest upon probable cause even when

the person seized does not actually suffer from a dangerous mental condition." (citation omitted)), *aff'd*, 185 F. App'x 22 (2d Cir. 2006).

Defendants rely on the phone call from Gayle, in which she stated that Richard threatened to harm himself, that he had guns in the house, and that Dunkelberger might be in danger.  (Second Am. Compl. ¶¶ 27–28, 30.)  Again, there is no indication that Gayle was a witness or that she told Defendants the basis for her knowledge, and Plaintiffs allege, upon information and belief, that the "police did not ask Gayle for the source of her information regarding Richard's alleged suicide or her belief that Dunkelberger might be in danger."  (*Id.* ¶ 31 (internal quotation marks omitted).)  Once Defendants arrived, Richard exhibited no behavior indicating that he might be a risk to himself or others.  (*See, e.g.*, *id.* ¶¶ 59, 64, 66, 90.) Additionally, as discussed above, Plaintiffs allege that Defendants knew that Dunkelberger was not in the home.  (*Id.* ¶ 112.)

It is a close call whether Defendants would generally be entitled to rely exclusively on the phone call from Gayle to establish probable cause.  Defendants had more information than cases where courts have held there was insufficient probable cause.  For example, in *Kerman*, the officers made a warrantless entry into the plaintiff's home and detained him based solely on an anonymous and uncorroborated 911 call.  261 F.3d at 237–38.  There, the Second Circuit held that there was insufficient probable cause but nonetheless upheld the district court's grant of summary judgment on the false arrest claim on the basis of qualified immunity.  *Id.*  Here, by contrast, the phone call was not anonymous.  But Defendants also had less information than cases where courts have held there was sufficient probable cause to arrest.  For example, in *Bayne v. Provost*, No. 04-CV-44, 2005 WL 1871182 (N.D.N.Y. Aug. 4, 2005), a licensed nurse who was employed by the plaintiff to aid him in his daily activities "called the 911 emergency

24

number after having a telephone conversation with [the] [p]laintiff," "informed the 911 operator that she was a nurse, that [the] [p]laintiff was her patient, and that [the] [p]laintiff had told her during a telephone call that he planned to commit suicide," and indicated that one possible method of suicide might be an overdose of pills, and, upon arriving, the troopers "observed multiple bottles of pills about the residence." *Id.* at *1–2.  There, unlike in this case, the tipper provided the basis for her knowledge, and at least one aspect of her story was corroborated before the arrest.  In other cases, such as *Mittelman v. County of Rockland*, No. 07-CV-6382, 2013 WL 1248623 (S.D.N.Y. Mar. 26, 2013), the tipper was an eyewitness and the victim of the alleged threats.  *See id.* at *12 ("[The officer] was informed by [the complainant] directly that [the plaintiff] threatened to shoot him.  That alone provided probable cause to arrest him . . . ." (citation omitted)).  Finally, in *Glowczenski v. Taser International Inc.*, No. 04-CV-4052, 2010 WL 1936200 (E.D.N.Y. May 13, 2010), a mother called the police reporting that her son was "having a psychotic episode, and was hearing voices."  *Id.* at *2 (internal quotation marks omitted).  The court held that the mother's 911 calls, combined with the fact that the officers had knowledge of the son's history of mental illness and the fact that the family expressed fear that he might be a danger to himself was sufficient for a finding that probable cause existed.  *Id.* at *6.

　　　Although Defendants may have been entitled to rely on the call from Gayle, or at least may have been entitled to qualified immunity on this ground, in the absence of other allegations, here Defendants had reasons to doubt the veracity of Gayle's statements.  In particular, as discussed below, Plaintiffs allege that the police Defendants and the Dunkelberger Defendants, including Gayle, entered into a conspiracy to deprive Ricard of his constitutional rights.  Specifically, although Gayle told the police that Dunkelberger might be in danger, Plaintiffs

allege that the police Defendants knew that Dunkelberger was not at home.  (Am. Compl. ¶ 112.)

Thus, there were reasons for Defendants to doubt the veracity of Gayle's statement, and, taking

Plaintiffs' allegations as true, it was unreasonable for them to rely on that statement alone,

especially in the absence of any corroborating information, to think they had probable cause to

arrest.  *See Williams v. City of New York*, No. 14-CV-5123, 2015 WL 4461716, at *4 (S.D.N.Y.

July 21, 2015) ("A police officer may have probable cause to arrest and charge a suspect based

on information provided by a single victim or witness, 'unless circumstances raise doubts as to

the person's veracity.'" (quoting *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir. 2001))).[8]

Therefore, the Court denies the State Trooper Defendants' and the Somers Police Defendants'

Motions To Dismiss the False Arrest claim.[9]

### d.  Excessive Force Claim

Defendants next move to dismiss Plaintiffs' Fourth Amendment excessive force claim.

(*See* Somers Police Defs.' Mem. 12–14; State Trooper Defs.' Mem. 18–19.)  "Application of

physical force is excessive when it is more than is necessary under the circumstances."  *Brown v.

City of New York*, No. 11-CV-1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013).

Qualified immunity may also be a defense to an excessive force claim.  In this context, "the

question for the purposes of qualified immunity is whether a reasonable officer could have

believed that the use of force alleged was objectively reasonable in light of the circumstances."

---

[8] The Court notes that Plaintiffs' allegations that the Dunkelberger Defendants and the police Defendants conspired to have Dunkelberger removed from Plaintiffs' residence, that Gayle then made the false report, and that the police Defendants then swarmed to Plaintiffs' residence are the only reasons Plaintiffs' claims are surviving the Motions.  These claims likely will, at some point, have to be substantiated in order for the case to survive summary judgment.

[9] To be clear, the Court rejects both Defendants' argument that Plaintiffs fail to state a false arrest claim, and their argument that they are entitled to qualified immunity.  As discussed, taking Plaintiffs' allegations as true, the police Defendants did not have even arguable probable cause to arrest Richard under the MHL.

*Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 594 (S.D.N.Y. 2013) (internal

quotation marks omitted).  Plaintiffs allege four categories of conduct by Defendants that could

arguably constitute excessive force: (1) excessively tight handcuffing of Richard; (2) threatening

Richard and Sarah with arrest and destruction of property; (3) pointing their guns at Richard; and

(4) physical force in grabbing Sarah's arm and kicking or punching Richard while he was lying,

handcuffed on the ground.  The Court will address each type of conduct in turn.

### i.  Handcuffing

The Court will first address whether Plaintiffs have stated an excessive force claim based

on the handcuffing of Richard.  "Courts apply a separate standard to claims for excessive force in

the use of handcuffs."  *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14

(S.D.N.Y. Sept. 4, 2012).  This particularized standard reflects the need to balance the "right to

use some degree of coercion," including the use of tight handcuffs "to prevent the arrestee's

hands from slipping out," *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y.

2005) (internal citation omitted), with the use of "overly tight handcuffing" that could constitute

excessive force, *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468

(S.D.N.Y. 2008).  When considering whether handcuffing constitutes excessive force, a court "is

to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored

the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists."

*Usavage*, 932 F. Supp. 2d at 592 (internal quotation marks omitted); *see also Pelayo v. Port

Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (same).  Additionally, "there is a consensus

among courts in [the Second Circuit] that tight handcuffing does not constitute excessive force

unless it causes some injury beyond temporary discomfort."  *Usavage*, 932 F. Supp. 2d at 592

(brackets and internal quotation marks omitted).  "These injuries need not be severe or

permanent, but must be more than merely de minimis." *Id.* (citation and internal quotation marks

omitted). Here, although Plaintiffs plead that Richard complained to the troopers that the

handcuffs were too tight and were hurting him, and that the troopers did not loosen them,

(Second Am. Compl. ¶ 52), there is no allegation that Richard suffered any injury as a result.

Therefore, Plaintiffs fail to state a claim for excessive force based on the handcuffing of Richard.

*See, e.g.*, *Selvaggio v. Patterson*, — F. Supp. 3d —, 2015 WL 1293007, at *13 (E.D.N.Y. Mar.

20, 2015) (granting summary judgment on excessive force claim where the evidence showed

only minimal injuries such as scabbing and abrasions); *Green*, 2015 WL 1455701, at *20

(dismissing excessive force handcuffing claim, in part because the plaintiff failed to allege that

she suffered an injury as a result of the handcuffing); *Lozada v. City of New York*, No. 12-CV-38,

2013 WL 3934998, at *5 (E.D.N.Y. July 29, 2013) (granting motion to dismiss excessive force

claim because the plaintiff's "vague reference to injuries" and a "complaint of a swelled wrist

[were] insufficient" (internal quotation marks omitted)).

### ii.  Threats of Arrest and Destruction of Property

Plaintiffs allege that Delaney threatened Sarah with arrest, (Second Am. Compl. ¶¶ 71,

79), and threatened that he would rip the gun safe off the wall or get a locksmith to open the safe

if Plaintiffs did not cooperate, (*id.* ¶ 77). "A threat of force does not constitute excessive force."

*Mittelman*, 2013 WL 1248623, at *13; *see also Smith v. City of New York*, No. 14-CV-5934,

2015 WL 3929621, at *3 n.3 (S.D.N.Y. June 17, 2015) ("To the extent that [the plaintiff] intends

to assert an excessive force claim based on threats of violence in his affidavit, the claim would

fail because, in [the Second] Circuit, neither mere verbal abuse nor mere threats of force support

an excessive force claim."); *Pelt v. City of New York*, No. 11-CV-5633, 2013 WL 4647500, at

*13 (E.D.N.Y. Aug. 28, 2013) ("Because [the] [p]laintiff alleges nothing beyond mere threats of

force, [his] excessive force claim fails.").  Moreover, even if there are circumstances under which threats could be sufficient for excessive force, a threat of arrest is not such a situation, *see Robertson v. Town of Washington*, No. 13-CV-3020, 2015 WL 1564888, at *11 (W.D. La. Apr. 6, 2015) (holding that the plaintiff did not state a claim for excessive force based on, inter alia, a threat to arrest); *Wilson v. Fla. Dep't of Revenue*, No. 14-CV-4726, 2015 WL 136557, at *7 (N.D. Cal. Jan. 8, 2015) ("A claim for *threatened* arrest, seizure or search is not cognizable under the Fourth Amendment."); *Periera v. Lizzio*, No. 09-CV-1024, 2012 WL 1205750, at *2 (M.D. Pa. Apr. 11, 2012) ("[T]hreats of arrest alone are insufficient to make out an 'excessive force' claim under the Fourth Amendment."); *Szalabawka v. Russo*, No. 09-CV-88, 2011 WL 7776786, at *15 (W.D. Pa. Sept. 28, 2011) (holding that the plaintiff did not allege an excessive force claim based on allegations that he was told to "shut up" and was threatened with arrest); *Shuey v. Schwab*, No. 08-CV-1190, 2010 WL 479938, at *4 (M.D. Pa. Feb. 4, 2010) ("[T]he alleged threats to arrest [the plaintiff] standing alone cannot support a claim of excessive force."); *Sherman v. City of Davis*, No. 04-CV-2320, 2008 WL 553632, at *9 (E.D. Cal. Feb. 26, 2008) (granting summary judgment on claims related to threats of arrest), *adopted by* 2008 WL 822180 (E.D. Cal. Mar. 26, 2008), *aff'd*, 362 F. App'x 726 (9th Cir. 2010), nor is a threat to destroy property, *see United States v. Ramirez*, 523 U.S. 65, 71 (1998) (treating "[e]xcessive or unnecessary destruction of property in the course of a search" as an unreasonable search violation, rather than an excessive force violation).  Therefore, any excessive force claim based on these alleged threats is dismissed.

### iii.  Brandishing Weapons

Next, Richard alleges that several officers had guns pointed at him.  (Second Am. Compl. ¶¶ 37–39, 41–43.)  He was then made to lay face down and was handcuffed from behind.  (*Id.*

¶ 44.)  The Troopers then searched Richard, finding a small pocketknife.  (*Id.* ¶¶ 46, 49.)  He was then placed in the police vehicle, still handcuffed.  (*Id.* ¶ 51.)  After this point, Plaintiffs do not allege that any weapons were pointed at Richard, although at least six officers had their weapons out.  (*Id.* ¶ 80.)  The State Trooper Defendants and the Somers Police Defendants are, at the very least, entitled to qualified immunity with respect to their use of guns, as the vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law, and Plaintiffs do not allege other facts that could change the calculus.  *See Cabral v. City of New York*, No. 12-CV-4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman*, 2013 WL 1248623, at *13 ("Likewise insufficient is [the] [p]laintiff's assertion that the officers pointed guns at him.  A threat of force does not constitute excessive force."); *Askins v. City of New York*, No. 09-CV-10315, 2011 WL 1334838, at *3 (S.D.N.Y. Mar. 25, 2011) ("While the Second Circuit has noted that circuit law could very well support a claim that a gunpoint death threat issued to a restrained and unresisting arrestee represents excessive force, [the] plaintiff's assertion that a gun was pointed at his head cannot be the basis of a claim for excessive force." (alterations and internal quotation marks omitted)); *Aderonmu v. Heavey*, No. 00-CV-9232, 2001 WL 77099, at *3 (S.D.N.Y. Jan. 26, 2001) (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct").  Therefore, Plaintiffs' excessive force claim based on the drawing of the guns is dismissed.

iv.  Physical Force

Plaintiffs allege that after Richard was lying face down, with his hands cuffed behind his back, Delaney struck Richard in his back with a fist or foot, causing him pain and to lose his breath.  (Second Am. Compl. ¶ 45.)  Under the allegations in the Second Amended Complaint, there is no indication that Richard was resisting arrest in any way.  Additionally, Plaintiffs allege that later Delaney "roughly grabbed" Sarah's arm when she was unable to open the case containing the key to Richard's gun case.  (*Id.* ¶ 82.)  Defendants argue that this force used was de minimis and therefore cannot state a constitutional violation.

Defendants are correct that "[a]n arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim."  *Greenaway v. County of Nassau*, — F. Supp. 3d —, 2015 WL 1509486, at *9 (E.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted) (quoting *Landy v. Irizarry*, 884 F. Supp. 788, 798 n.14 (S.D.N.Y. 1995)).  "Such injury need not be severe, however."  *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); *see also Kastle v. Town of Kent*, No. 13-CV-2256, 2014 WL 1508703, at *8 (S.D.N.Y. Mar. 21, 2014) (noting that "courts have allowed plaintiffs to recover, even though the injury caused was not permanent or severe, where the force used was excessive" (internal quotation marks omitted) (quoting *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar. 8, 2011))).  Indeed, in *Robison v. Via*, 821 F.2d 913 (2d Cir. 1987), the Second Circuit held that while the fact that the plaintiff sustained only minor injuries "may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure [to seek medical care for her alleged injuries] is not fatal to her claim."  *Id.* at 924.

Here, Plaintiffs have alleged that Richard suffered an injury from the kick or punch.  (*See* Second Am. Compl. ¶ 45 ("Upon information and belief, while he was face down, [D]efendant

[Delaney] demanded [Richard] disclose where he kept his guns, striking [Richard] in his back with a fist or foot, causing him pain and to lose his breath.").  Moreover, under the circumstances alleged, Plaintiffs have plausibly alleged that the use of force was objectively unreasonable. When evaluating whether the use of force was reasonable, courts are to consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) ("Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.  In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." (alteration, citations, and internal quotation marks omitted)); *Burks v. Perrotta*, No. 13-CV-5879, 2015 WL 2340641, at *4 (S.D.N.Y. May 15, 2015) (same).  In making this assessment, the Court must examine the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, . . . [and must] make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Tracy*, 623 F.3d at 96 (internal quotation marks omitted).  Thus, "[n]ot every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

Here, the nature of the conduct at issue points to it being permissible to use some level of force. However, at the time of the punch/kick, Richard was on the ground, and handcuffed with his hands behind his back. Under the facts alleged, Richard posed no immediate threat to the safety of others. Further, Richard was not actively resisting in any way. Therefore, as alleged, Plaintiffs state a claim for excessive force based on the kick or punch to Richard's back. *See Smith v. Fields*, No. 95-CV-8374, 2002 WL 342620, at *5–6 (S.D.N.Y. Mar. 4, 2002) (denying summary judgment on excessive force claim, and defense, where there was an issue of fact as to whether the plaintiff was slapped and kicked in the head after he was handcuffed). Further, under the facts alleged, no reasonable officer could have thought this use of force was necessary, and thus Delaney is not shielded by qualified immunity. *See id.* (rejecting qualified immunity defense where the plaintiff claimed he was kicked and slapped after being handcuffed).

The Court next turns to the alleged use of force against Sarah. As noted above, an "arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Greenaway*, 2015 WL 1509486, at *9 (internal quotation marks omitted). Sarah does not allege any injury whatsoever. However, Sarah was not an arrestee, and, under the facts as alleged, there was no reason for the Defendant officers to suspect she was a threat to herself or anyone else. Courts have allowed excessive force claims to go forward even in the absence of injury when the allegedly excessive force was applied to a bystander not suspected of any wrongdoing. *See Piper v. City of Elmira*, 12 F. Supp. 3d 577, 595 (W.D.N.Y. 2014) (denying summary judgment where "no dispute exist[ed] that [the plaintiff] suffered no physical injury," because "a jury could conceivably find that no force was appropriate in these circumstances and that [the

defendant's] two-handed attempt to throw her to the floor was, at the very least, gratuitous and unrelated to any legitimate law enforcement purpose").  Therefore, while the absence of injury may ultimately point to the force not being constitutionally excessive, the Court will not dismiss on this ground.

Turning next to the reasonableness of the conduct, the Court concludes that, as alleged, the conduct at issue, roughly grabbing Sarah's arm, was objectively unreasonable.  Sarah was not suspected of any wrongdoing; she did not pose an immediate threat to the safety of the officers or others; and she was not actively resisting arrest.  Furthermore, at that point, Richard was handcuffed with his hands behind his back, placed in the patrol car, and searched, (*see* Second Am. Compl. ¶¶ 48–49, 69, 80, 82), and the house had already been searched, (*see id.* ¶¶ 59, 69, 82).  As alleged, it is plausible that any force whatsoever used against Sarah was unreasonable, and that no reasonable officer would have thought it necessary.  *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Bedenfield v. Shultz*, No. 01-CV-7013, 2002 WL 1827631, at *9 (N.D. Ill. Aug. 7, 2002) ("Using force of any kind on a citizen the officer knows to be innocent is unreasonable.").  Therefore, the Motions To Dismiss Plaintiffs' excessive force claims against Delaney based on the punch/kick to Richard's back and his grabbing of Sarah's arm are denied.

### e.  Fifth Amendment Claim

The State Trooper Defendants move to dismiss any claims Plaintiffs seek to assert based on the continued interrogation of Richard after Richard exercised his right to remain silent and without *Miranda* warnings being given.  (*See* Reply Mem. of Law in Further Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper Defs.' Reply" 8 (Dkt. No.

34

32).)[10]  Plaintiffs allege that Richard declined to respond to interrogation, exercising his Fifth

Amendment rights, and that Delaney did not administer *Miranda* warnings, but continued to

interrogate him.  (Second Am. Compl. ¶¶ 78–79.)  Plaintiffs also allege that, in continuing to

interrogate him, Delaney threated to arrest him and Sarah if he declined to cooperate.  (*Id.* ¶ 79.)

As a result of this interrogation, Richard agreed to disclose the key's location to Sarah.  (*Id.*)

Even assuming that Delaney's conduct was unconstitutional, Plaintiffs still have not

stated a § 1983 claim.  As the Second Circuit has explained, "a § 1983 action may exist under the

Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the

plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the

statements thereby obtained were used against the plaintiffs in a criminal proceeding."  *Deshawn*

*E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).  Even if Plaintiffs have

plausibly alleged that Richard was coerced to answer Defendants' questions, Plaintiffs have not

alleged that any inculpatory statements were used against Richard in a criminal proceeding, and

therefore this claim must be dismissed.  *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003)

(rejecting § 1983 claim because the petitioner was "never made to be a witness against himself in

---

[10] In reply, the State Trooper Defendants argued for the first time that Plaintiff's Fifth Amendment, Eighth Amendment, and Second Amendment claims should be dismissed.  (*See* State Trooper Defs.' Reply 8–9.)  Although courts normally do not consider arguments raised for the first time in reply, *see, e.g.*, *Mason Tenders Dist. Council of Greater N.Y. v. Fortune Interiors Dismantling Corp.*, No. 12-CV-4253, 2015 WL 4503630, at *5 n.5 (S.D.N.Y. July 23, 2015); *Okor v. Borough of Manhattan Cmty. Coll.*, No. 14-CV-1593, 2015 WL 3750630, at *4 n.6 (S.D.N.Y. June 16, 2015), the Court has discretion to do so, *see, e.g.*, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005); *Marks v. Energy Materials Corp.*, No. 14-CV-8965, 2015 WL 3616973, at *5 n.11 (S.D.N.Y. June 9, 2015); *Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-CV-3940, 2015 WL 1443038, at *7 (E.D.N.Y. Mar. 27, 2015); *see also Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009), and here the Court granted Plaintiffs permission to file a surreply brief addressing these arguments that were raised for the first time in reply, (*see* Dkt. No. 33).  Therefore, the Court will consider these arguments.

violation of the Fifth Amendment's Self-Incrimination Clause because his statements were never admitted as testimony against him in a criminal case"); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 370 (S.D.N.Y. 2010) ("In order to bring a § 1983 claim based on such violations, a plaintiff must show that his privilege against self-incrimination was violated, and such a violation cannot be shown where that plaintiff denies making any inculpatory statements that were used against him in a criminal proceeding."); *Rodriguez v. Kelly*, No. 05-CV-10682, 2009 WL 911085, at *3 (S.D.N.Y. Apr. 6, 2009) (holding that coerced incriminatory statements do not violate the Fifth Amendment if not used against the speaker, but that "[a] successful section 1983 claim may arise when a plaintiff is coerced into waiving Fifth Amendment rights, and utters self-incriminating or inculpatory statements later used against him in a criminal proceeding."), *aff'd sub nom. Rodriguez v. City of New York*, 364 F. App'x 702 (2d Cir. 2010); *see also Deshawn E.*, 156 F.3d at 346 ("The remedy for a violation of the right against self–incrimination is the exclusion from evidence of any ensuing self-incriminating statements and not a § 1983 action." (internal quotation marks omitted)); *Selvaggio*, 2015 WL 1293007, at *3 n.9 (same); *LaFrance v. Bemben*, No. 10-CV-4583, 2013 WL 132702, at *7 (E.D.N.Y. Jan. 10, 2013) (same).  Therefore, Plaintiffs' Fifth Amendment claim based on the interrogation of Richard is dismissed.

In their Surreply, Plaintiffs claim that their allegations about Richard's interrogation should be considered a substantive due process violation under the Fourteenth Amendment. (Mem. of Law in Sur-Reply to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b)(6) of the FRCP ("Pls.' Surreply") 4–5 (Dkt. No. 34).)  In support of this contention, Plaintiffs cite *Chavez v. Martinez*, 538 U.S. 760 (2003).  In *Chavez*, the Supreme Court rejected the claim of the petitioner, who claimed that the un-Mirandized interrogation of him violated his rights under the Fifth Amendment's Self-Incrimination Clause.  *See id.* at 766–67.  However, the Supreme

Court also remanded the case to allow the petitioner to pursue a claim of liability based on a substantive due process violation under the Fourteenth Amendment. *See id.* 779–80. Thus, while conceding their Fifth Amendment claim is not viable (leaving open the question of why it was included in the first place), Plaintiffs now wish to pursue a substantive due process claim. (*See* Pls.' Surreply 5.)

The Court is troubled by this shift in Plaintiffs' theory. Nowhere in Plaintiffs' Second Amended Complaint do Plaintiffs maintain a violation of their substantive due process rights. Instead, Plaintiffs only referenced their procedural due process rights (along with their Second, Fourth, Fifth, and Eighth Amendment rights). (Second Am. Compl. ¶¶ 103–05.) Therefore, the Court dismisses Plaintiffs' Fifth Amendment claim, but gives Plaintiffs leave to amend the complaint to include (if there is a good faith basis under the law to do so) a substantive due process claim.

### f. Eighth Amendment Claim

The State Trooper Defendants also move to dismiss Plaintiffs' Eighth Amendment claim, arguing that the Eighth Amendment applies only post-conviction. (State Trooper Defs.' Reply 8.) They are correct, and, indeed, Plaintiffs concede this point in their Surreply. (*See* Pls.' Surreply 5.) Because the relevant conduct occurred without either Plaintiff being convicted of a crime—or even charged with a crime—Plaintiffs' claims relating to their treatment are cognizable only as Fourth and Fourteenth Amendment claims, and their Eighth Amendment claim is dismissed. *See Whitley v. Albers*, 475 U.S. 312, 318 (1986) ("The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." (citation and internal quotation marks omitted)); *Lindsey*

*v. Butler*, 43 F. Supp. 3d 317, 325–26 (S.D.N.Y. 2014) ("[The] [p]laintiff claims that the officers subjected him to excessive force in violation of the Eighth Amendment.  The Court must dismiss this claim because the Eighth Amendment attaches only after conviction.  Because the excessive force claim arises in the context of a custodial interrogation during the arrest process, the constitutional right at issue derives from the Fourth Amendment." (citations omitted)), *on reconsideration in part*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 657 (S.D.N.Y. 2000) ("[T]he Eighth Amendment right to be free from cruel or unusual punishment applies only to the post-conviction stage.").  Plaintiffs acknowledge that their Eight Amendment claim is not viable, but ask to convert it to a Fourteenth Amendment claim.  (Pls.' Surreply 5.)  Plaintiffs may do so in a Third Amended Complaint to be filed within 30 days of this Opinion and Order.

### g.  Second Amendment Claims

The State Trooper Defendants also move to dismiss Plaintiffs' Second Amendment claim.  (*See* State Trooper Defs.' Reply 9.)  The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  The right of an individual to keep and bear arms has been affirmed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).  This right, however, is not absolute, *Heller*, 554 U.S. at 602, and within the Second Circuit, "the contours of [the right to bear arms] are as of yet underdeveloped and ill-defined," *Doutel v. City of Norwalk*, No. 11-CV-1164, 2013 WL 3353977, at *23 (D. Conn. July 3, 2013).  Prior to *Heller* and *McDonald*, in *Garcha v. City of Beacon*, 351 F. Supp. 2d 213 (S.D.N.Y. 2005), *aff'd*, 232 F. App'x 74 (2d Cir. 2007), a court in

this District held that "the right to bear arms is not a right to hold some particular gun." *Id.* at 217 (internal quotation marks omitted). Since *Heller* and *McDonald*, lower courts in the Second Circuit have continued to follow *Garcha*, noting specifically that when an individual's right to acquire firearms generally has not been infringed, the confiscation of a specific weapon does not constitute a Second Amendment violation. *See*, *e.g.*, *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 430 (S.D.N.Y. 2013) (relying on *Garcha* in dismissing a Second Amendment claim because "there [was] no allegation that [the] [d]efendants' actions . . . affected [the] [p]laintiff's ability to retain or acquire other firearms or ammunition, and no law [was] cited that infringe[d] on [the] [p]laintiff's right to obtain other firearms"); *McGuire v. Village of Tarrytown*, No. 08-CV-2049, 2011 WL 2623466, at *7 (S.D.N.Y. June 22, 2011) (holding that a police department's seizure of a plaintiff's handgun pursuant to an order of protection did not violate the plaintiff's Second Amendment right to bear arms); *see also Doutel*, 2013 WL 3353977, at *25 ("Several cases in this circuit have followed *Garcha*'s reasoning post-*Heller* and *McDonald* and have held that where a plaintiff's ability to acquire *other* firearms has not been abridged, a Second Amendment violation has not occurred even despite a seizure of a plaintiff's *particular* firearm.") (emphasis in original); *accord Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014) ("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention."), *cert. denied*, 135 S. Ct. 478 (2014); *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011) (holding there was no Second Amendment violation where the "defendants' policy and action affected *one* of [the plaintiff's] firearms," but did not prevent him "from retaining or acquiring other firearms," but "not foreclos[ing] the possibility that some plaintiff could show

that a state actor violated the Second Amendment by depriving an individual of a specific

firearm that he or she otherwise lawfully possessed for self-defense").  Thus, there is a very real

question whether Plaintiffs have adequately pled a violation of the Second Amendment from the

mere claim that the police Defendants seized Richard's guns.  Indeed, in their Surreply

Memorandum, Plaintiffs offered not a single case that addressed the issue or that suggested that

the cases cited above should be disregarded.

    In any event, even if Plaintiffs had pled a plausible Second Amendment claim, the police

Defendants would be entitled to qualified immunity.  As previously noted, an officer is entitled

to qualified immunity if he or she has not violated a clearly established statutory or constitutional

right.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The Second Circuit has set forth three

criteria of a clearly established right: "(1) the law is defined with reasonable clarity, (2) the

Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant

would have understood from the existing law that his conduct was unlawful.'"  *Schubert v. City

of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d

Cir. 2004)).  The State Trooper Defendants and Somers Police Defendants are entitled to

qualified immunity for the Second Amendment allegation because, at the very least, it was

reasonable for them to assume that they were not violating the Second Amendment by taking

action that resulted in the seizure of specific firearms from Richard, where there are no

allegations that they prevented him from retaining or acquiring other firearms.  Second

Amendment law post-*Heller* and *McDonald* is "ill defined" in this context, *Doutel,* 2013 WL

3353977 at *23, and, the Second Circuit case law that does exist arguably suggests that seizure

of a specific firearm does not violate the Second Amendment.  Therefore, because the State

Trooper and Somers Police Defendants were entitled to rely on these lower court rulings, it was

40

reasonable for them to conclude they was not violating Richard's constitutional right to bear

arms by confiscating his firearms.  *Doutel*, 2013 WL 3353977 at *25 (holding that

"[d]efendants . . . are entitled to rely on the holdings of [Circuit and lower court] cases" "[a]bsent

authority . . . reversing the holdings in [those cases]".).  Therefore, the Court therefore dismisses

Plaintiffs' Second Amendment Claim.[11]

### 4.  § 1985 Conspiracy Claim against all Defendants

The Dunkelberger Defendants and the State Trooper Defendants argue that Plaintiffs

have insufficiently alleged a § 1985 conspiracy that would allow Plaintiffs to hold them liable for

constitutional violations.  (*See* State Trooper Defs.' Mem. 19; Mem. of Law Supporting Mot. To

Dismiss ("Dunkelberger Defs.' Mem.") 6–8 (Dkt No. 17).)  Plaintiffs allege that the

Dunkelberger Defendants agreed to try to have Richard arrested and remove him and his

weapons from his home.  (Second Am. Compl. ¶ 26.)  In particular, they agreed that Gayle

would file a false police report alleging that Richard threatened to harm himself and had

weapons in the house in the hopes that police would arrest Richard for the weapons and remove

him and Sarah from the premises.  (*Id.* ¶ 27.)  Gayle reported this false claim, (*id.* ¶ 28), after she

"was advised that the troopers would want to enter the home to search and remove the weapons

in there but that they could not enter without a warrant unless an emergency existed" and that if

Richard "threatened someone at the house, police could use such a threat to search the house for

the person threatened and remove both the weapons and [Richard]," (*id.* ¶ 29).[12]  Plaintiffs

further allege that Gayle had Dunkelberger removed from the home "at the direction of the State

Police," and then reported to police that Dunkelberger "might be in danger," (*id.* ¶ 30), and that

---

[11] In their Surreply Memorandum, Plaintiffs did not address the qualified immunity
defense as it relates to the Second Amendment claim.

[12] The Complaint does not allege who advised Gayle of this.

the State Trooper and Somers Police Defendants conspired with the Dunkelberger Defendants to "use concern over the absence of [Dunkelberger] from the home in order for police to enter [P]laintiffs' home on the preten[s]e of searching for [Dunkelberger], when all the conspirators knew he was not at the residence," (*see id.* ¶¶ 112–13.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "In addition, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks omitted). The Court holds that Plaintiffs have plausibly pleaded facts, namely that the police Defendants searched the home purporting to look for and protect Dunkelberger when they knew he was not home, tending to show that the police Defendants and the Dunkelberger Defendants had agreed to act in concert to inflict an unconstitutional injury—the unreasonable, warrantless search of Plaintiffs' home. The Court recognizes that Plaintiffs have offered little by way of explanation as to how they believe the police Defendants conspired with the Dunkelberger Defendants, but it is not the Court's job to judge how believable these allegations are, or the likelihood they will be borne out at later stages of this case, but rather to assess whether Plaintiffs have plausibly pleaded the elements of the claim. Although this claim may one day be ripe for summary judgment, the Court denies Defendants' Motions To Dismiss this claim.

### 5.  Claims against Dunkelberger Defendants

#### a.  Mental Hygiene Law

The Dunkelberger Defendants argue that there is no private right of action under the New York Mental Hygiene Law.  (Dunkelberger Defs.' Mem. 8–9.)  Plaintiff disputes this, citing exclusively to a Sixth Circuit case interpreting Michigan state law.  (*See* Mem. of Law in Opp'n to Defs. Richard Henry Dunkelberger, Merilyn [Gale] Dunkelberger, William Willard Dunkelberger, Benjamin Dunkelberger['s] Mot. To Dismiss 10 (Dkt. No. 26) (citing *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997))).  *See also Monday*, 118 F.3d at 1102–03.  Of course, the question of whether there is a private cause of action under a Michigan Mental Health Code has no bearing on whether there is a private cause of action under the New York analog. The Court's own research shows that every court to have addressed the issue has held that there is no private right of action under the Mental Hygiene Law, except with respect to one provision not at issue here.[13]  *See McWilliams v. Catholic Diocese of Rochester*, 536 N.Y.S.2d 285, 286 (App. Div. 1988) ("The Mental Hygiene Law is a regulatory statute . . . . No private cause of action is authorized for violations of the Mental Hygiene Law. Although [the plaintiff] is an intended beneficiary of the legislation, a private cause of action should not be implied because it would not be consistent with the legislative scheme."); *see also Byng v. Delta Recovery Servs., LLC*, No. 13-CV-733, 2013 WL 3897485, at *15 n.3 (N.D.N.Y. July 29, 2013), *aff'd*, 568 F. App'x 65 (2d Cir. 2014); *Sulehria v. New York*, No. 12-CV-21, 2012 WL 1288760, at *10 (N.D.N.Y. Feb. 8, 2012), *adopted by* 2012 WL 1284380 (N.D.N.Y. Apr. 16, 2012); *June v.*

---

[13] New York state courts have held that there is a private right of action under N.Y. Mental Hygiene Law § 33.13, which addresses the confidentiality of medical records.  *See Godinez v. Siena Coll.*, 733 N.Y.S.2d 262, 266 (App. Div. 2001); *Ace v. State*, 553 N.Y.S.2d 605, 607 (Ct. Cl. 1990), *aff'd*, 616 N.Y.S.2d 640 (App. Div. 1994), *aff'd*, 665 N.E.2d 656 (N.Y. 1996).

*Blair*, No. 09-CV-323, 2010 WL 8522831, at *17 (N.D.N.Y. Sept. 30, 2010), *adopted in relevant part, rejected in part by* 2012 WL 1048463 (N.D.N.Y. Mar. 28, 2012); *Byng v. Campbell*, No. 07-CV-471, 2010 WL 681374, at *18–19 (N.D.N.Y. Feb. 24, 2010); *Lombardo v. Holanchock*, No. 07-CV-8674, 2008 WL 2543573, at *10 (S.D.N.Y. June 25, 2008); *Lombardo v. Stone*, No. 99-CV-4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001).  In any event, it does not appear that Plaintiffs even seek to assert a claim under the New York Mental Hygiene Law against the Dunkelberger Defendants.  Indeed, the only claim related to the Mental Hygiene Law in the Second Amended Complaint is asserted against the New York State Troopers for allegedly misusing the law and for falsifying evidence against Richard.  (*See* Second Am. Compl. ¶¶ 131– 35 (alleging that the State Trooper Defendants manufactured evidence against Richard and detained him under the law without basis).)  For the foregoing reasons, any claim Plaintiffs seek to assert against the Dunkelberger Defendants under the New York Mental Hygiene Law is dismissed.

### b.  Conversion

"Under New York law, 'conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 514 (S.D.N.Y. 2012) (quoting *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir. 2006)).  To state a conversion claim, "the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012) (internal quotation marks omitted).  Plaintiffs have sufficiently alleged such a

claim.  Specifically, Plaintiffs allege that in or about December 2012, "without knowledge, permission or right, . . . an unknown member of the NY State Police, wrongfully, illegally and without the permission or consent of [Richard], released [Richard's] weapons to the [Dunkelberger Defendants], who have since refused to return them to [Richard] despite a demand to do so . . . ."  (Second Am. Compl. ¶ 93.)  Plaintiffs have thus plausibly alleged that the Dunkelberger Defendants, acting without authorization, exercised a right to ownership over Richard's property, that Richard made a demand for the property, and that that demand was refused.  The Dunkelberger Defendants' Motion to Dismiss this claim is therefore denied.

### c.  Cross-Claims

The Dunkelberger Defendants also move to dismiss any cross claims remaining brought against them by the Somers Police Defendants.  Their argument, in its entirety, to this is: "For the reasons stated previously, to the extent any claims against Defendants Siegal or Fitzgerald remain after their Motion to Dismiss, the Court should dismiss any cross-claims they raised against the Dunkelberger Defendants."  (Dunkelberger Defs.' Mem. 9.)  The Somers Police Defendants do not mention this Motion at all, either in their initial Memorandum of Law or in their reply.  (*See generally* Somers Police Defs.' Mem; Reply Mem. of Law in Further Supp. of Defs.[] Siegal and Fitzgerald's Mot. To Dismiss the Compl. (Dkt. No. 30).)  In reply, the Dunkelberger Defendants assert that "to the extent that [the Somers Police Defendants] still assert cross-claims against all other Defendants, those against the Dunkelberger Defendants should be dismissed."  (Reply Mem. of Law Supporting Dunkelberger Defs.' Mot. To Dismiss

7–8 (Dkt. No. 29).)  Strangely, though, the Somers Police Defendants *never brought* cross-

claims; therefore, there is nothing for the Court to dismiss (or not dismiss).[14]

### III.  Conclusion

For the foregoing reasons, the Dunkelberger Defendants', the Somers Police Defendants',

and the State Trooper Defendants' Motions To Dismiss are granted in part and denied in part.

As to the claims alleged against the State Trooper and Somers Police Defendants, the Court

grants Defendants' Motions To Dismiss Plaintiffs' state law claims, Plaintiffs' Fifth Amendment

self-incrimination claim, Plaintiffs' Eighth Amendment Claim, Plaintiffs' Second Amendment

Claim, and Plaintiffs' excessive force claim, except as to Delaney's alleged use of force against

Richard and Sarah as described herein.  As to the claims alleged against the Dunkelberger

Defendants, the Court grants the Motion To Dismiss Plaintiffs' claim based on the New York

Mental Hygiene Law.  The Court denies Defendants' Motion as to the unreasonable search

claim, the false arrest claim, the excessive force claim against Delaney related to his use of force

against Sarah and Richard, the § 1985 conspiracy claim, and the conversion claim.  The claims

that are dismissed are dismissed with prejudice, as Plaintiffs have already twice amended,

including once in response to Defendants' pre-motion letters raising the arguments addressed in

the instant Opinion.  *Justice v. McGovern*, No. 11-CV-5076, 2013 WL 1809634, at *3 (E.D.N.Y.

Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant

leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his

complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is

proper" (brackets, citation, ellipses, and internal quotation marks omitted)); *Tyler v. Liz*

---

[14] Based on the fact that the Dunkelberger Defendants first raised the issue of dismissing cross-claims asserted against them around the time of removal, (Dkt. Nos. 1, 5–8), the Court surmises that the claims may have been brought in state court prior to removal.

*Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation.") Nonetheless, Plaintiff may file a Third Amended Complaint to the extent permitted herein to add new claims within 30 days of the date of this Opinion and Order.

The Clerk of the Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 17, 18, 21.)

SO ORDERED.

Dated:      September 30 , 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

47